## GENERAL ELECTRIC COMPANY *vs.* BOARD OF ASSESSORS OF LYNN.

Suffolk. September 13, 1984. — December 31, 1984.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil,* Presumptions and burden of proof. *Taxation,* Real estate tax: assessment, value. *Evidence,* Value, Reproduction cost, Expert opinion, Admissions and confessions. *Value.*

Where a municipal board of assessors challenged the sufficiency of a taxpayer's case in a proceeding before the Appellate Tax Board by a motion to dismiss, but chose to present its own case after the motion had been denied, the question presented to this court on appeal was whether, based upon all the evidence, the taxpayer had met its burden of persuasion, and not whether the taxpayer had met its initial burden of producing evidence. [597-600]

The Appellate Tax Board did not abuse its discretion in considering the testimony of an expert witness even though the witness did not have personal knowledge of all of the facts on which his opinion was based. [600-602]

In a proceeding before the Appellate Tax Board brought by a taxpayer challenging the valuation of its property by the board of assessors of Lynn, the Appellate Tax Board did not err in admitting in evidence the assessors' answers to interrogatories from another case, involving an appeal by the city of Lynn of the equalized valuation determined by the Department of Revenue for another year. [602-604]

On appeal to the Appellate Tax Board from refusals by the assessors of a city to abate real estate taxes on certain industrial property, the board was entitled to rely on the methodology used by an expert witness for the assessors in determining the value of the property without accepting the figures arrived at by the expert. [604-605]

In a proceeding before the Appellate Tax Board brought by a taxpayer seeking an abatement of local real estate taxes assessed on land and buildings used for industrial purposes, the board did not err in rejecting the depreciated replacement cost method of valuation, used by an expert witness for the assessors in valuing the property. [605-507]

Where a decision of the Appellate Tax Board granting abatements of real estate taxes was supported by substantial evidence, this court declined to reverse the decision based on a claim by a city's assessors that the board's finding of overvaluation was so minimal as to be arbitrary. [607]

In determining the value of certain real estate under the capitalization of income approach using a single tenancy model the Appellate Tax Board was not required to apply a tax factor. [        ]

APPEAL from a decision of the Appellate Tax Board.

*Laurence S. Fordham* (*Stephen B. Deutsch & ,Barry A. Guryan* with him) for the taxpayer.

*John M. Lynch* for the Board of Assessors of Lynn.

LYNCH, J. The General Electric Company (taxpayer) and the Board of Assessors of Lynn (assessors) bring cross appeals from a decision by the Appellate Tax Board (board) granting abatements to the taxpayer for fiscal years 1981 and 1982. The board found that the assessors had overvalued the taxpayer's property, and granted abatements in the amounts of $45,922 for fiscal year 1981 and $106,292.34 for fiscal year 1982.

The taxpayer contends on appeal that it is entitled to a greater tax abatement than that awarded by the board. It argues that the board erred in failing to take property taxes into account in valuing the property under the capitalization of income approach. On cross appeal, the assessors raise several arguments in support of their original valuation and, alternatively, of the board's decision. They argue on three grounds that the board erred in granting the abatements. First, they contend that the taxpayer failed to present sufficient evidence to meet its burden of proof. Second, they argue that the board erred in failing to consider the assessors' evidence of valuation under the depreciated replacement cost method. Third, they contend that the board's finding of overvaluation was arbitrary because the over-valuation was minimal and did not warrant granting the abatements. The assessors argue, alternatively, that the board did not err in its calculation of the value of the property under the capitalization of income approach, so that the amounts of the resulting abatements are appropriate. The assessors raise two grounds in support of this argument. First, they contend that the taxpayer failed during the hearing before the board to introduce sufficient evidence of the effect of taxes on valuation and cannot now raise the issue for the first time on appeal. Second, they argue that the board did not err in its calculation, based on

the evidence presented, of the effect of taxes on the value of the property.

We conclude that the taxpayer met the burden of proving its entitlement to an abatement. Furthermore, we conclude that the board's valuation of the property was supported by substantial evidence. We affirm the board's decision granting abatements for fiscal years 1981 and 1982.

In fiscal years 1981 and 1982, the tax years at issue, the taxpayer was the owner of two parcels of real estate in Lynn, known collectively as the River Works. For valuation purposes, the parcels were broken down into the River Works North (north parcel) at 1100 Western Avenue, Lynn, and the River Works South (south parcel) at 701 Lynnway, Lynn. In fiscal year 1981, the south parcel was valued at $1,326,800, and assessed a tax at the rate of $191 per $1,000 for a total of $253,418.80; the north parcel was valued at $15,604,310 and assessed a tax at the rate of $191 per $1,000 for a total of $2,980,423.21. In fiscal year 1982, the south parcel was valued at $1,326,400 and assessed a $216,203.20 tax at the rate of $163 per $1,000; the north parcel was valued at $15,614,780 and assessed a $2,545,209.14 tax at the rate of $163 per $1,000.

The River Works is a major industrial property. The north and south parcels are adjacent to each other and separated by the Boston and Maine Railroad tracks. The entire complex consists of a total of 8,866,435 square feet or 203.55 acres, of which the north parcel contains 129.43 acres and the south parcel contains 74.12 acres. The property is in a good location, relatively close to Boston and well serviced by public transportation. Both parcels have good frontage on major traffic arteries, and the complex abuts the Saugus River. All utilities are available, including water, sewer, gas, and electricity. There are several easements held by the various utility companies, the city of Lynn, and the MBTA for the railroad.

The property has large paved areas used for parking and an extensive system of interior roadways. It is also improved with a large number of buildings of various sizes and designs containing in excess of 3.8 million square feet of area, of which approximately 3.3 million square feet is contained in the north parcel. Construction of the various buildings began prior to the turn of the century and has continued up to the recent past.

The taxpayer has made various alterations and additions as its developing needs have dictated, so that the complex grew and expanded over the years up to the assessment dates.

The buildings can be grouped into five classes according to their use. The first class consists of multi-storied buildings located throughout the north parcel and used mainly for offices and administration. The second class, the aircraft engine business group, consists of one-story and multi-storied buildings used for light manufacturing, aircraft engine assembly, and office support. The third class, the gear works and industrial marine turbine division, consists of a series of large, integrated buildings used for heavy industrial purposes. The fourth class consists of the test cells used for testing manufactured products. The fifth class comprises the buildings used for personnel or employee relations. The over-all condition of the buildings is good because the taxpayer has a continuing program of maintenance and capital improvements.

The board held thirty-four days of hearings between February 14, 1983, and April 26, 1983, to consider the taxpayer's petitions for abatements. On December 22, 1983, the board promulgated its decision and issued its findings of fact and report pursuant to G. L. c. 58A, § 13. The board found the fair cash value of the River Works to be $44,400,000 for each of fiscal years 1981 and 1982. After application of the effective tax rates of $71.80 and $59.80 for those years, respectively, the board granted total abatements for the River Works of $45,922 for fiscal year 1981, and $106,292.34 for fiscal year 1982. As apportioned between the two parcels, the abatements for fiscal year 1981 were $41,161.01 for the north parcel, and $4,761.04 for the south parcel. The abatements for fiscal year 1982 were $97,188.54 for the north parcel, and $9,103.84 for the south parcel.

During the course of hearings before the board, both parties presented evidence of the fair cash value of the property. The taxpayer introduced two expert real estate appraisers, Paul W. Shoup and David L. Cary, who testified to valuations based on the market and capitalization of income methods of valuation. The taxpayer's experts dismissed the reproduction and

replacement cost approaches as being too speculative due to the age of most of the buildings and the difficulty in establishing a valid estimate of depreciation.

The taxpayer also introduced the assessors' answers to interrogatories filed in an unrelated proceeding before the board. In those answers, the assessors had stated that they valued all industrial property in the city at $45,694,000, and that, based on these answers, all property owned by the taxpayer, including parcels not involved in this proceeding, had a value of $20,334,928.

The assessors introduced expert testimony regarding three valuation approaches, the replacement cost, market, and capitalization of income methods, but relied only on the replacement cost and capitalization of income methods to generate a value for the two River Works parcels.

The board found that one of the taxpayer's expert witnesses, Shoup, relied more on the market approach to valuation than on the capitalization of income approach. The board accorded little or no weight to the value testified to by Shoup, which was based on comparison of the River Works to the sales prices of allegedly comparable properties. During the course of Shoup's testimony, evidence of the sales prices of some allegedly comparable properties was struck because of his lack of personal knowledge of the properties, or because they were found not to be sufficiently comparable, or because they included the sales of unallocated personal property. The board found that the market approach was inadequate to supply a basis for finding fair cash value. It concluded that this method requires too many adjustments for variables such as location, time, and amenities, reasoning that "[t]hese types of large, heavy industrial properties are not customarily bought and sold on a regular basis to allow the formation of a valid opinion of fair cash value."

The board then considered the testimony of the taxpayer's second expert witness, Cary, as to valuation under the capitalization of income approach. Cary computed fair cash value under two alternative assumptions: single tenancy and multiple tenancy. The board concluded that, under both of these assump-

tions, a reliable fair cash value figure could be estimated. After considering the market for comparable rentals and expenses, Cary found values of $15,900,000 for single tenancy, and $15,200,000 for multiple tenancy. The board found that he applied an appropriate capitalization rate and used a tax factor when necessary under the multiple tenancy approach. Cary did not use a tax factor in calculating fair cash value under the single tenancy approach.

Relying on Cary's testimony, on the assessors' answers to interrogatories in an unrelated case, and on the testimony of Richard J. Dennis, the assessors' expert witness, the board found that the taxpayer had successfully sustained the burden of proving that it was entitled to an abatement.

The board then considered the evidence presented by the assessors as to the value of the property. The assessors first introduced evidence under the replacement cost approach to valuation. Two qualified engineers and a qualified real estate appraiser testified. The appraiser, Martin J. Coleman, used the figures introduced by the engineers to arrive at his opinions that the fair cash value of the property was $78,500,000 in fiscal year 1981, and $83,900,000 in fiscal year 1982. The board concluded that Coleman properly applied the replacement cost methodology, but found that "the cost approach, either reproduction or replacement, is too speculative and highly suspect in this instance. There are too many variable factors, such as efficiency, depreciation and economic obsolescence which must be applied to find a fair cash value. These are a result of the age, the complex interaction of the manufacturing processes in the buildings, and the massive expanse of the complex."

The board concluded that the best approach to valuing the property was the capitalization of income approach. It found the approach of Dennis, the assessors' second expert appraiser, "with some modifications, to be the most credible." Dennis divided the property into six categories and estimated its total fair cash value under the capitalization of income approach to be $63,200,000 in fiscal year 1981, and $58,300,000 in fiscal year 1982. He assigned rentals to five of the six categories,

excluding the support buildings. The board adopted his categories and also his premise that the valuation be based on single occupancy. The board rejected the multiple tenancy approach because "[t]he possibility of a developer purchasing this property and parceling it out on a multitenancy approach is somewhat remote." The board found support for this conclusion in the testimony of one of the taxpayer's expert appraisers, Cary, in which he obtained a higher fair cash value under the single tenancy approach than under the multiple tenancy approach. The board found that the highest and best use of the River Works was its current use in all six categories, and stated that the proper approach to valuation under the capitalization of income approach was to consider the current use and assign economic rents to the various subcategories of use.

The board reached its finding as to valuation by analyzing the property as if it were under a long-term, single tenancy net lease. It adjusted the income figures testified to by Dennis in order to account for certain economies of scale and certain expenses which the owner of the property would bear under the net lease. It used a 2% vacancy/rent loss factor and a constant 12% capitalization rate for the two fiscal years at issue. The capitalization rate included a rate of return and a depreciation factor. The board did not, however, apply a tax factor "because of the net rental with the tenant being fully responsible for all real estate taxes."

The board found that the gross potential income of the entire complex was $5,910,000, and found the net income to be $5,328,456, after applying the vacancy/rent loss and expense factors. At the 12% capitalization rate, the fair cash value of the property for both years at issue was $44,400,000. On the basis of that value, the board arrived at the total abatements previously mentioned.

1. *Burden of proof.* The assessors challenge the partial abatements granted by the board, contending that the board erred by deciding that the taxpayer had sustained its burden of proving that its property was overvalued. In finding that the taxpayer had met this burden, the board relied on the testimony of both Cary, the taxpayer's expert witness, and Dennis, the assessors'

expert witness, as well as the assessors' answers to inter-
rogatories filed in an unrelated case.[1] The assessors argue that
Cary's opinion testimony as to value was based largely on
contradicted hearsay that did not constitute substantial evi-
dence. In addition, the assessors argue that the admission dis-
cussed later in this opinion also was not probative of fair cash
value, because it related to a different type of proceeding in
a prior year. Finally, the assessors argue that their own expert's
testimony did not support the taxpayer's case. Thus, it is ar-
gued, the taxpayer could not have sustained its burden of prov-
ing that its property was overvalued.

It is well established that the burden of persuasion is on the
taxpayer to show that its property was overvalued. *Northwest
Assocs.* v. *Assessors of Burlington*, 392 Mass. 593, 594 (1984).
*Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679,
684 (1982). *Schlaiker* v. *Assessors of Great Barrington*, 365
Mass. 243, 245 (1974). *Judson Freight Forwarding Co.* v.
*Commonwealth*, 242 Mass. 47, 55 (1922). Furthermore, we
have held that the board is entitled to "presume that the valu-
ation made by the assessors was valid unless the taxpayers
sustained the burden of proving the contrary." *Schlaiker* v.
*Assessors of Great Barrington, supra.* But this is not a true
"presumption," which would alter the burden of producing
evidence.[2] It is instead merely a restatement that "the burden
of persuasion is from the outset on one party." P.J. Liacos,
Massachusetts Evidence 50 (5th ed. 1981). See, e.g., *Grocery
Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass.
70, 85 (1979) ("presumption" of regulation's validity means
challenging party has burden of proving irrationality); *Potter*
v. *John Bean Div. of Food Mach. & Chem. Corp.*, 344 Mass.

---

[1] The board stated: "In weighing the evidence on the merits of the case,
the board gave more weight to the evidence of Mr. Dennis than to the
admission and [the taxpayer's] expert."

[2] See P.J. Liacos, Massachusetts Evidence 54 (5th ed. 1981). See also
*Epstein* v. *Boston Hous. Auth.*, 317 Mass. 297, 302 (1944), where we
stated that "a presumption, using the word in its technical and proper sense,
can have no operative effect unless it assists the party having the burden
of proof."

420, 425 (1962) ("presumption" of due care restates that burden of persuasion on that issue is on the defendant); *Commonwealth* v. *Boyd*, 367 Mass. 169, 188 (1975) ("presumption" of innocence simply serves to state that the prosecution has burden of persuasion).

By holding that the assessment is entitled to a presumption of validity, we are only restating that the taxpayer bears the burden of persuasion of every material fact necessary to prove that its property has been overvalued. See, e.g., *Staples* v. *Commissioner of Corps. & Taxation*, 305 Mass. 20, 26 (1940). In *Schlaiker* v. *Assessors of Great Barrington, supra*, this court held that, when the board found "no credible or persuasive evidence that the taxpayers' property had a lower value than that assessed, it was proper for the board to conclude that the taxpayers had not sustained the burden of proof." This recognizes the long-standing rule that the initial burden of producing evidence is on the party having the burden of proof (see *Powers* v. *Russell*, 13 Pick. 69, 76-77 [1832]), and failure to introduce sufficient evidence to warrant a finding for that party will result in a dismissal or a directed verdict. See, e.g., *DiMarzo* v. *S. & P. Realty Corp.*, 364 Mass. 510, 514 (1974).

In proceedings before the board, the assessors may test the sufficiency of the taxpayer's case by a motion to dismiss similar to the provisions of 801 Code Mass. Regs. § 1.01 (7) (d) (1) (1979).[3] The assessors did so in this case, and the motion was denied. Rather than resting at that time and appealing an adverse decision, the assessors chose to present their own case, thereby waiving their right to assert error in the board's refusal to grant

---

[3] Title 801 Code Mass. Regs. § 1.01 (7) (d) (1) (1979) states: "Upon completion by the initiating Party of the presentation of evidence, the responding Party may move to dismiss on the grounds that, upon the facts and/or the law, the initiating Party has not sustained its case." Although procedure before the board is not governed by the Code of Mass. Regs., we have held that it is nevertheless subject to the "general principles affecting administrative decisions." *Assessors of New Braintree* v. *Pioneer Valley Academy, Inc.*, 355 Mass. 610, 612 n.1 (1969). See Rules 16 and 37 of the Rules of Practice and Procedure of the Appellate Tax Board (1982). This motion is similar to both a motion for involuntary dismissal under Mass. R. Civ. P. 41 (b) (2), 365 Mass. 803 (1974), and a motion for directed verdict under Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974).

General Electric Co. v. Board of Assessors of Lynn.

the motion. Cf. *Martin* v. *Hall*, 369 Mass. 882, 884-885 (1976) (rule 50[a]); *A. & N. Club* v. *Great Am. Ins. Co.*, 404 F.2d 100, 103-104 (6th Cir. 1968) (rule 41[b][2]). Therefore, the assessors' appeal now tests whether the board's decision that the taxpayer had met its burden of persuasion, made upon *all* of the evidence, is supported by substantial evidence, not whether the board was correct in finding that the taxpayer had met its initial burden of production.[4]

As this court stated in *Donlon* v. *Assessors of Holliston*, 389 Mass. 848, 855 (1983), "[t]he taxpayer may present persuasive evidence of overvaluation either by exposing flaws or errors in the assessors' method of valuation, or by introducing affirmative evidence of value which undermines the assessors' valuation." In this case, the taxpayer chose the second method to prove that its property was overvalued, utilizing the expert testimony of Cary and answers to interrogatories filed by the city of Lynn in another case.

*a. Cary's testimony*. Cary, an expert witness for the taxpayer, stated that in his opinion the fair cash value of the property under the single-tenancy income capitalization approach was $15.9 million. As a basis for this opinion, Cary testified to thirteen property rentals that he believed were comparable to the taxpayer's situation. The assessors claim that Cary lacked the requisite personal familiarity with material facts relating to these comparables, and that his reliance on hearsay destroyed any probative worth of his testimony. We conclude that Cary's testimony was properly considered by the board.

In *National Bank of Commerce* v. *New Bedford*, 175 Mass. 257, 261 (1900), Chief Justice Holmes set forth the basic rule relating to expert testimony in these circumstances: "An expert may testify to value although his knowledge of details is chiefly derived from inadmissible sources, because he gives the sanc-

---

[4] In *Schlaiker* v. *Assessors of Great Barrington, supra* at 245 n.2, we stated that "a conclusion that a presumptively valid assessment must stand is by its nature not such an affirmative finding as to require substantial evidence to support it." This means that when the taxpayer has not sustained its initial burden of *production*, the board's decision upholding the assessment is not subject to the substantial evidence test.

tion of his general experience. But the fact that an expert may use hearsay as a ground of opinion does not make the hearsay admissible." Thus, an expert must have some knowledge of the particular facts to enable him to bring his expertise to bear. P.J. Liacos, Massachusetts Evidence, *supra* at 110. He may not provide by hearsay the only evidence describing the property to which his opinion of value relates. *State Tax Comm'n* v. *Assessors of Springfield*, 331 Mass. 677, 684 (1954). The generalized information that goes into the making of his expertise and the formulation of his expert opinion may be derived from hearsay, but not his knowledge of the specific facts in controversy. P. J. Liacos, Massachusetts Evidence, *supra* at 112. Nevertheless, when an expert, in the course of his investigation of the facts, accepts as true "a matter of detail which he has not verified, the fact gains an authority which it would not have had from the printed page alone, and, subject perhaps to the exercise of some discretion, may be admitted." *Finnegan* v. *Fall River Gas Works Co.*, 159 Mass. 311, 312-313 (1893). See *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 574 (1956), quoting *Commonwealth* v. *Bellino*, 320 Mass. 635, 638, cert. denied, 330 U.S. 832 (1947) (a witness's expertise "may well qualify him to give an opinion in reference to a problem which he has never before encountered in precisely the same form").

Furthermore, there is no requirement that experts must derive their opinions exclusively from direct personal observations. *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 384 (1980). *Andrews, petitioner*, 368 Mass. 468, 475 (1975). *Miller* v. *Smith*, 112 Mass. 470, 475 (1873). It is not indispensable that a witness with Cary's qualifications actually observe all of the properties. *Boston Gas Co.* v. *Assessors of Boston, supra.* As an expert, Cary was entitled to draw conclusions in part from information that he "learned from inquiries he had made and the answers given." *Johnson* v. *Lowell*, 240 Mass. 546, 550 (1922).

When an expert's opinion is based in part on inadmissible hearsay, that fact goes to the weight of his testimony, not to its admissibility. *Potter* v. *John Bean Div. of Food Mach. &*

*Chem. Corp.*, 344 Mass. 420, 424 (1962). See *Davenport* v. *Haskell*, 293 Mass. 454, 458-459 (1936); *Johnson* v. *Lowell, supra*; K.B. Hughes, Evidence § 327, at 414 (1961). This rule recognizes that the hearsay basis of the expert's opinion may be exposed and attacked on cross-examination, as occurred in this case. See *Kuklinska* v. *Maplewood Homes, Inc.*, 336 Mass. 489, 496 (1957). Cary admitted under cross-examination that he lacked a great deal of specific information about the properties he considered to be comparable, and that much of the information he did know was based on hearsay. But this is not a case where the expert's conclusion was based wholly on "mere guess or conjecture." *Ruschetti's Case*, 299 Mass. 426, 431 (1938). See *Milch* v. *Boston Consol. Gas Co.*, 341 Mass. 230, 233 (1960). Cary demonstrated knowledge of many material facts gained from the personal observation of some of the properties he judged to be comparable to an extent sufficient to allow the board to give his testimony some weight. See *Boston Gas Co.* v. *Assessors of Boston, supra* at 585. Therefore, we cannot say that the board abused its discretion, *H.H. Hawkins & Sons* v. *Robie*, 338 Mass. 61, 65 (1958), by relying on Cary's expert opinion of value.[5]

b. *Admission.* The taxpayer introduced in evidence answers to interrogatories from another case involving an appeal by the city of Lynn of the equalized valuation determined by the Department of Revenue for another year.[6] In these answers, the assessors stated that as of January 1, 1979, the fair cash value of all industrial property in Lynn totalled approximately

---

[5] The assessors also contend that their expert witness effectively rebutted much of Cary's testimony, including that which was not based on hearsay. This contention merely goes to the weight to be accorded Cary's opinion and was therefore a decision for the board to make. *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 307 (1982). *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 702 (1972). The board is "not required to believe the testimony of any particular witness but it could accept such portions of the evidence as appeared to have the more convincing weight." *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941). See *Metevia* v. *Athol*, 348 Mass. 274, 280 (1964).

[6] *Assessors of Lynn* v. *Department of Revenue*, A.T.B. Docket No. 113188 (Dec. 1, 1980).

$45.7 million, and, based on these answers, the fair cash value of "General Electric Company industrial plant" would be approximately $20.3 million.[7] In reaching the latter figure, the assessors accepted an appraisal commissioned by the taxpayer. The assessors argue that these interrogatories were irrelevant to the present determination of fair cash value, since they related to a different proceeding, for a different year, and instituted for different purposes. We hold that the board properly could have considered the answers to these interrogatories as an admission and did not abuse its discretion by giving them some weight.

Evidentiary admissions are the "conduct of a party while not on the stand used as evidence against him at trial. The conduct may be in the form of an act, a statement, or a failure to act or make a statement." P.J. Liacos, Massachusetts Evidence, *supra* at 275-276. Unlike judicial admissions,[8] evidentiary admissions are not binding "in the sense that the real value could not be shown by other competent evidence." *Brackett* v. *Commonwealth*, 223 Mass. 119, 127 (1916). *Waltham Watch & Clock Co.* v. *Waltham*, 272 Mass. 396, 402 (1930). Unlike most prior inconsistent statements, an evidentiary admission is admissible for substantive purposes, not merely on the narrow issue of credibility. *Brown* v. *Metropolitan Transit Auth.*, 341 Mass. 690, 695 (1961). *Langan* v. *Pianowski*, 307 Mass. 149, 152 (1940). *Sweetser* v. *Jordan*, 211 Mass. 393, 397 (1912).

---

[7] The assessors argue that the probative worth of this admission is lessened by the fact that the taxpayer's property referred to in the answer was not specifically identified. Thus, it is contended that "industrial plant" might refer to something more than the property in question. If so, the admission would be stronger evidence against the position of the assessors, since it would reduce the admitted cash value of the property now being considered.

[8] Judicial admissions "conclusively determine an issue [and] they relieve the other party of the necessity of presenting evidence on that issue." P.J. Liacos, Massachusetts Evidence, *supra* at 2. See *Beaumont* v. *Segal*, 362 Mass. 30, 32 (1972). Answers to interrogatories in the same case constitute evidentiary, not judicial, admissions. *McMahon* v. *M & D Builders, Inc.*, 360 Mass. 54, 61 (1971).

In the circumstances of this case, we see no reason why the board could not treat the answers to interrogatories as an evidentiary admission on the question of value. The fact that the admission was made for wholly different purposes and in an unrelated proceeding goes to the weight accorded it, but does not in and of itself render it inadmissible or make it devoid of probative value. See *Brackett* v. *Commonwealth, supra* (certificate of condition filed with the Secretary of the Commonwealth admissible as admission in eminent domain proceeding); *Manning* v. *Lowell*, 173 Mass. 100, 103 (1899) (memorandum given to tax assessors admissible as admission in eminent domain proceeding); *Longo* v. *Board of Appeals of Malden*, 6 Mass. App. Ct. 835 (1978) (application for tax abatement admissible as admission in another proceeding). And although answers to interrogatories do not constitute "pleadings" (see *Aerostatic Eng'g Corp.* v. *Szczawinski*, 1 Mass. App. Ct. 141, 144 [1973]), we do find persuasive this court's prior decisions holding that pleadings in another case are admissible as admissions if material and authorized by the admitting party. *DiMare* v. *Capaldi*, 336 Mass. 497, 504-505 (1957). *Clarke* v. *Taylor*, 269 Mass. 335, 336 (1929). Furthermore, although the admission involved a prior year, because of the reasonable proximity to the years at issue in this case, the lack of any significant alterations to the taxpayer's property in the intervening period, and the enormous disparity between the challenged valuations and the admission, the board reasonably could have found the admission to be probative on the issue whether the assessment was excessive.[9]

c. *Dennis' testimony.* The board also relied on the testimony of Dennis, the assessors' expert witness, to support its decision to grant abatements to the taxpayer. The assessors argue that nothing in Dennis' testimony supported the board's decision. But by accepting the methodology proposed by Dennis, the board was not required to accept every figure in Dennis' testi-

---

[9] The assessors' argument that the figures supplied by Cary and by the admission differed significantly is irrelevant. Both figures were less than half of the assessment and were therefore still persuasive that the assessment was incorrect.

mony. See *Jordan Marsh Co.* v. *Assessors of Malden*, 359 Mass. 106, 110 (1971). The board was entitled to "*select the various elements of value as shown by the record and from them form*, as it properly did, its own independent judgment" (emphasis in original). *North American Philips Lighting Corp.* v. *Assessors of Lynn*, 392 Mass. 296, 300 (1984), quoting *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941).

In this case, the board adjusted the figures advanced by Dennis to reflect greater economies of scale and additional expenses, as well as by adding a vacancy/rent loss factor, to reach a proper assessed value resulting in an abatement to the taxpayer. The Legislature has directed this court to "give due weight to the experience, technical competence, and specialized knowledge" of agencies on judicial review of their decisions. G. L. c. 30A, § 14, as amended by St. 1976, c. 411, § 1.[10] Considering the expertise of the board, we cannot say that the adjustments made by the board resulting in abatements to the taxpayer were not supported by substantial evidence in the record.

2. *Depreciated replacement cost approach.* The board found that the best approach to value in this instance was the capitalization of income method and refused to apply the depreciated replacement cost (DRC) method of valuation as testified to by one of the assessors' expert appraisers, Coleman. The board found that Coleman had properly applied the DRC methodology, but it rejected the approach as "too speculative and highly suspect" for use in valuing the River Works. It found that there were too many variable factors involved in this case to reach an estimate of fair cash value under the DRC approach. We conclude that the board was warranted in not adopting the DRC method of valuation. "The board is entitled to select valuation methods, as long as they are reasonable and supported

---

[10] The board is not governed by the provisions of G. L. c. 30A, but we have held that, when reviewing its decisions, we shall nevertheless apply the general principles affecting judicial review of administrative decisions. *Assessors of New Braintree* v. *Pioneer Valley Academy, Inc.*, 355 Mass. 610, 612 n.1 (1969).

by the record." *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 477 (1984). In no case have we compelled the board to adopt the DRC method of valuation where an alternative method is available. On the contrary, it is the least favored approach to determining value. "We have generally viewed with disfavor the use of the [DRC] approach to valuation except where the special character of the property makes it substantially impossible to arrive at value on the basis of capitalized net earnings or on the basis of comparable sales. . . . The disfavored status of the [DRC] method derives in major part from uncertainty in accurately measuring obsolescence and physical depreciation." *Id.* at 477-478. See *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 687 (1982); *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 362-364 (1978).

The board did not adopt the DRC method in finding a fair cash value for the River Works because of just such uncertainty in measuring efficiency, depreciation, and economic obsolescence. The board attributed the variable factors which made valuation difficult under this approach to "the age, the complex interaction of the manufacturing processes in the buildings, and the massive expanse of the complex."

In light of the board's finding that an alternative method of valuation was available and that numerous difficulties would have arisen in applying the DRC method, it is clear that the board was not required to consider that method of valuation in this case. The record supports the board's finding that the age, number, and complexity of the structures in the River Works complex would have made valuation under the DRC method "highly speculative." Furthermore, the board was able to arrive at a value under another methodology. The availability of an alternative method of valuation made valuation under the DRC method unnecessary. The assessors get no support from cases in which we have held that the DRC method was *appropriate*. See, e.g., *Blakeley* v. *Assessors of Boston, supra* at 477-478 (original cost used under DRC method to value building under construction since comparable sales were not available and structure was not yet income producing); *Newton*

*Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 193 (1956) (specialized use of Girl Scout camping land constituted special circumstances that warranted use of DRC method to value taking of part of land by eminent domain).

3. *Minimal overvaluation.* The assessors also urge us to reverse the tax abatements granted by the board, claiming that the board's finding of overvaluation was so minimal as to be arbitrary. The assessors correctly note that fair cash value cannot be proven with mathematical certainty, and this court has consistently held that such a decision is one for the board's "own independent judgment." *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941). *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 473 (1981). We will not disturb that decision unless it is unsupported by substantial evidence, and therefore we decline to do so here. *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 465-466.

4. *Tax factor.* The taxpayer argues that the board erred in failing to employ a tax factor when determining the fair cash value of a single tenancy property under the capitalization of income approach. We conclude that there was no error.

"Until the taxpayer sustains his burden [of proof], the valuation made by the assessors will be presumed valid." *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 684 (1982). *Northwest Assocs.* v. *Assessors of Burlington*, 392 Mass. 593, 594 (1984). *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243, 245 (1974). At the hearing, the taxpayer did not challenge the methodology of not using a tax factor in applying capitalization of income principles to single tenancy properties. On the contrary, one of the taxpayer's expert witnesses, Cary, estimated a value for the River Works under a single tenancy approach, and did not apply a tax factor when capitalizing the stream of rental income. The taxpayer, therefore, appears to have applied the same methodology at the hearing as that later adopted by the board. At least it raised no objection to the experts' failure to apply a tax factor when determining valuation under the single tenancy approach. The

testimony at the hearing relative to use of a tax factor related to multiple tenancy properties and not to the assumption used by the board, that of a substantial single tenant under a long-term net lease.

Since the issue was not raised below, it is unnecessary for us to consider it here. *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 87-88 (1977), and cases cited. "This court does not consider issues which do not appear to have been raised before the board." *Foxboro Assocs.*, *supra* at 690 (citing G. L. c. 58A, § 13). Even assuming that the issue is properly before us, we discern no error.

The standard to be used in determining fair cash value is well known and without dispute. It is the fair market value, which is "the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy." *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 566 (1956). The market value of real estate generally "[can]not be proved with mathematical certainty and must ultimately rest in the realm of opinion, estimate and judgment." *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941). The board may choose among, at least, three alternative methods of valuation. *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 362 (1978) (comparable sales, income capitalization, and depreciated replacement cost methods). "The board's decision must be supported by substantial evidence considering the entire record before the board. . . . Where there is substantial evidence to support the board's decision, we defer to the board's judgment as to what evidence to accept and which method or methods of valuation to rely on." *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 302 (1982).

The board ultimately adopted the capitalization of income approach as most suitable to determine the fair cash value of the River Works.[11] The board considered evidence as to valua-

---

[11] The board stated in its opinion that, "[i]n considering and giving weight to the potential rental income of the property, [it] relied on the principal [*sic*] that the earning capacity of the land is competent to show its market value." We conclude that the board's reasons for rejecting the comparable

ation under this approach for both single tenancy and multiple tenancy properties. Two expert appraisers, Cary for the taxpayer and Dennis for the assessors, estimated the value of the property under the capitalization of income approach. Cary presented estimates under the single and multiple tenancy approaches, and Dennis estimated value under the single tenancy approach. Both testified to the rental value of comparable properties from which they then estimated the rental value of the River Works.[12]

In the multiple tenancy situation, the landlord rather than the tenant generally pays the real estate taxes. When employing the capitalization of income approach to valuing property under the multiple tenancy model, it is appropriate to use a tax factor when capitalizing the stream of rents from the tenants. *Taunton Redevelopment Assocs.* v. *Assessors of Taunton, ante* 293, 295 (1984). *Assessors of Lynn* v. *Shop-Lease Co.*, 364 Mass. 569, 573 (1974). The property is valued by first calculating gross rents from the tenants to the landlord, then deducting any expenses to the landlord to determine net income from the property, and finally applying a capitalization rate and a tax factor. See, e.g., *Alstores Realty Corp.* v. *Assessors of Peabody*, 391 Mass. 60, 62-71 (1984).

Under the single tenancy model used by the board, however, the tenant pays the real estate taxes as well as most other expenses associated with operating the property. The income received by the landlord is not reduced to account for operating expenses to the extent that the tenant pays those expenses. The board explained this theory in *Rule Indus., Inc.* v. *Assessors of Gloucester*, 2 Mass. App. Tax Bd. Rep. 128 (1983). "Basic real estate valuation principles define such single-occupancy premises as properties wherein a substantial amount of the burden of operating real property is transferred to the lessee. . . . [I]n a single-occupancy type net lease situation, real estate taxes are correctly considered as a responsibility of the

sales and depreciated replacement cost methods are persuasive in light of the over-all size and varied number, age, and uses of the numerous buildings.

[12] Since the River Works is owned and occupied by the taxpayer, no actual rent figure is available for the property.

lessee." *Id.* at 130. The board's finding that under a typical, single-occupancy net lease, the tenant pays the taxes is consistent with established real estate practices. See P. Fullerton, Appraisal of Industrial Property, Encyclopedia of Real Estate Appraising 497 (3d ed. 1978). See, e.g., *Erhard* v. *F.W. Woolworth Co.*, 374 Mass. 352, 354 (1978) (tenant retailer agreed in lease to pay real estate taxes).

In applying the capitalization of income approach to the comparable single tenancy properties and to the River Works as a hypothetical single tenancy property, the board determined the value of the property for tax purposes first by calculating the net rents from the tenant ("net rents" denotes that the tenant pays the operating expenses and taxes). The board then adjusted the net rent figure to account for vacancy/rent loss and for any expenses borne by the landlord. Finally, the board divided the adjusted net rent figure by a capitalization rate (12%) to determine the fair cash value of the property. The board found that it was not necessary to apply a tax factor or otherwise to account for real estate taxes because the figure constituting the rental income from the tenant reflected the assumption that the tenant pays the taxes. Accord *G. Friend, Inc.* v. *Assessors of Boston*, 2 Mass. App. Tax Bd. Rep. 30, 32-33 (1982). Under this methodology, it is not necessary to inquire further into the amount of the expenses, including the tax expense, actually borne by the tenant.[13]

We have already ruled that when a tenant pays a portion of the real estate taxes, the tax factor applied when capitalizing income must be reduced to reflect the tax payments by the tenant. See *Alstores Realty Corp.* v. *Assessors of Peabody*, 391 Mass. 60, 70 (1984). The methodology employed by the board in this case requires a similar result because in estimating net rents from the hypothetical River Works tenant, the board

[13] The assessors point out that if taxes are singled out and deducted from the expenses paid by the tenant under the net lease, other tenant expenses similarly should be analyzed to determine their comparability among the various properties being compared. As the assessors indicate, this could pose a serious practical problem. The board's approach in leaving taxes and other tenant expenses out of the analysis may be more reasonable.

assumed that the tenant, not the landlord, would pay the taxes. We conclude that, since the methodology adopted by the board is supported by the evidence presented by expert witnesses for both the taxpayer and the assessors, the board's finding as to the fair cash value of the River Works is supported by substantial evidence and is therefore affirmed.

*Decision of the Appellate Tax*
*Board affirmed.*