*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-1667 and 11-CF-1668

WILLIAM MCCORKLE and ANDRE CLINKSCALE, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-17877-08 and CF1-5414-09)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued February 19, 2014                          Decided September 25, 2014)

*Jessica Brand*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant William McCorkle.

*Andrew R. Szekely* for appellant Andre Clinkscale.

*James M. Perez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Jennifer Kerkhoff*, and *J.P. Cooney*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* FISHER.

Concurring opinion by *Chief Judge* WASHINGTON at page 21.

Concurring opinion by *Associate Judge* FISHER at page 23.

Concurring opinion by *Senior Judge* RUIZ at page 26.

FISHER, *Associate Judge*: On May 31, 2008, Duane Hough, Johnny Jeter, and Anthony Mincey were shot to death after an early-morning altercation at a gas station. Appellants William McCorkle and Andre Clinkscale were later indicted on a variety of charges stemming from that triple homicide and their subsequent attempts to obstruct justice. After a jury trial, McCorkle was convicted on fourteen charges and sentenced to 144 years of incarceration. The jury found Clinkscale guilty on seven charges, and he was later sentenced to 105 years in prison. On appeal, both appellants contend that the first prong of the *Laumer* test for admitting statements against penal interest,[1] which requires a trial court to assess the veracity of the witness who has offered to repeat the statement in court, unconstitutionally invades the province of the jury and has been implicitly overruled. Finding no reversible error on this or other grounds raised, we affirm.

## I. Factual Background

---

[1] *See Laumer v. United States*, 409 A.2d 190 (D.C. 1979) (en banc).

At trial, the government's case primarily focused on events that took place shortly after 4:00 a.m. on May 31, 2008. An altercation began that morning after McCorkle cut in front of Hough at the attendant's window of a gas station. The conflict escalated, and six eyewitnesses testified that they saw the shooting. A firearms expert determined that two different semi-automatic pistols were used in the murders, and medical examiners testified that Hough had been shot seventeen times, Jeter nine times, and Mincey eleven times. None of the witnesses, including McCorkle, said that they saw the victims with any weapons that morning. No guns belonging to the victims were found at the scene.

Harlenia Ray, a teenage girl from the neighborhood, testified in support of one of the obstruction of justice charges. She said that shortly after she was questioned by police, she received a visit from McCorkle and another man. They called her into a pickup truck and McCorkle told her, "don't say nothing" to the detectives.

McCorkle admitted that he shot Hough and Jeter, but claimed that he acted in self-defense. He took the stand and recounted that, after he provoked Hough's ire by cutting the line, he made every effort to calm the other man down and eventually tried to leave the gas station to prevent trouble. McCorkle said that

Hough followed him as he tried to walk away toward Holbrook Street and that Hough's associates cut him off with their vehicle near the exit from the gas station "on Holbrook Street closer to [Morse]." Hough was still outside the vehicle. When Hough and the driver made reaching motions, McCorkle thought they were reaching for firearms, so he pulled his semi-automatic pistol and began firing. McCorkle was in the street, with his back to the gas station lot, when he commenced firing at Hough. McCorkle said that he heard other shots and "thought the dude was shooting at me." McCorkle testified that, as he fled, he looked back and saw a friend of his, Trey Joyner, standing in front of Hough's black SUV and firing into it. By the time of trial, Trey Joyner was dead.

Clinkscale's defense was that he was not present and that "all acts attributed to him by the Government or the witnesses were committed by Trey Joyner." In addition to relying on McCorkle's testimony to this effect, Clinkscale sought to introduce the testimony of Tywon Hager, who was prepared to testify that Trey Joyner had admitted participating in the triple homicide, contrary to his penal interest. During an evidentiary hearing at which Mr. Hager gave his proffered testimony, McCorkle also requested that the statement of Trey Joyner be admitted. After the hearing, the trial court found that Hager was not credible and that the

defendants therefore had failed to establish that Mr. Joyner "made the reported statement."

## II.  The *Laumer* Test for Admitting Statements Against Penal Interest

Both appellants contend that the first prong of our test for admitting statements against penal interest, announced in *Laumer v. United States*, 409 A.2d 190 (D.C. 1979) (en banc), has been implicitly invalidated.  They assert that "[i]n the three-and-a-half decades since *Laumer* was decided, the Supreme Court and this court have increasingly recognized that rules of evidence that allow a judge, rather than the jury, to assess the credibility of a live witness as a basis for excluding his fact testimony are improper."  They claim that the "first *Laumer* prong unconstitutionally limits the criminal defendant's right to call witnesses in his favor and present a complete defense, and further impinges on his right to trial by jury."  *See* U.S. Const. amends. V, VI.  They therefore argue that the trial court erred when it excluded Tywon Hager's testimony based on its own assessment of his credibility.

### A.  The First Prong of *Laumer*

"'Hearsay' is any out-of-court statement 'offered in evidence to prove the truth of the matter asserted.'" *Martin v. United States*, 991 A.2d 791, 797 (D.C. 2010). Although "generally not admissible at trial[,]" *Laumer*, 409 A.2d at 194, hearsay "will be admissible if it falls under an exception." *Dutch v. United States*, 997 A.2d 685, 688 (D.C. 2010). Such exceptions "provide for the admission of statements because they exhibit certain indicia of reliability that overcome or outweigh the normal risks associated with the inherent dangers of hearsay statements." *Laumer*, 409 A.2d at 194.

Historically, our common law did not contain a hearsay exception for statements against penal interest. *See, e.g.*, *United States v. Alexander*, 430 F.2d 904, 906 (D.C. Cir. 1970) ("declin[ing] appellant's invitation" to adopt the exception for hearsay statements against penal interest). However, in *Laumer v. United States*, this court, sitting en banc, held that the "total rejection of declarations against penal interest . . . keeps reliable and probative evidence from the trier of fact[.]" 409 A.2d at 197. Nevertheless, "not all confessions are admissible, and we exclude those confessions that are inherently untrustworthy." *Id*. Therefore, in adopting a hearsay exception for declarations against penal interest, we preferred the approach of the federal rule because "it not only abolishes the doctrine that totally bars declarations against penal interest from

evidence, but also assures that proffered declarations against penal interest contain those indicia of reliability that are consistent with the rationale behind other hearsay exceptions." *Id.* at 199.

When assessing whether a statement fits within the declaration against penal interest exception, we require a "trial judge to undertake a three-step inquiry to ascertain (1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Id*. at 199. When applying the first prong of the test to determine "whether the declarant in fact made the proffered statement, the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration." *Id*. "If the trial judge concludes that no statement was made, then no basis exists for any further inquiry, and the proffered testimony should be excluded." *Id.*

The test we adopted was largely based on the federal hearsay exception for statements against penal interest, which, at the time of *Laumer*, required that the declarant be unavailable and that "corroborating circumstances clearly indicate the trustworthiness of the statement." Fed. R. Evid. 804 (b)(3). Although the first prong of *Laumer* is not explicitly set forth in the federal hearsay exception, federal

appellate courts have historically been split over whether a trial court should assess the credibility of the in-court witness as part of its corroborating circumstances analysis.[2]

Recently, however, in conjunction with an amendment to the Federal Rules, the Advisory Committee on Evidence Rules adopted the following commentary: "[T]he credibility of the witness who relates the statement is not a proper factor for the court to consider in assessing corroborating circumstances. To base admission or exclusion of a hearsay statement on the witness's credibility would usurp the jury's role of determining the credibility of testifying witnesses." Advisory Committee Note on the 2010 Amendments to Fed. R. Evid. 804 (b)(3), 28 U.S.C.A., p. 338 (West 2012). Thus far, only the Seventh Circuit has explicitly

---

[2] *Compare, e.g.*, *United States v. Hendrieth*, 922 F.2d 748, 750 (11th Cir. 1991) (the trial court may consider in-court witness's motive to misrepresent the matter), *and United States v. Rasmussen*, 790 F.2d 55, 56 (8th Cir. 1986) ("The trustworthiness of a statement against the declarant's penal interest is determined by analysis of two elements: 'the probable veracity of the in-court witness, and the reliability of the out-of-court declarant.'") (quoting *United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978)), *with, e.g.*, *United States v. Seeley*, 892 F.2d 1, 3 (1st Cir. 1989) ("the credibility of an in-court witness is ordinarily a matter for the jury"), *United States v. Katsougrakis*, 715 F.2d 769, 777 (2d Cir. 1983) ("preliminary assessment of the in-court witness' credibility would . . . be a usurpation of the jury function"), *and United States v. Atkins*, 558 F.2d 133, 135 (3d Cir. 1977) ("Rule 804(b)(3) directs the court to the trustworthiness of the declarant, not of the witness.").

acknowledged this revised commentary and changed its stance. *See United States v. Henderson,* 736 F.3d 1128, 1131 (7th Cir. 2013) ("The question of whether the declarant made the statement implicates the testifying witness's credibility; making credibility determinations is a role reserved to the jury.").[3] It now appears that the first prong of *Laumer*, which requires the trial court to assess the credibility of the in-court witness as part of the test for admitting statements against penal interest, represents a minority view.[4]

---

[3] The authority of an Advisory Committee's Notes has been debated. *Compare, e.g.*, *Tome v. United States*, 513 U.S. 150, 160 (1995) (Kennedy, J., plurality opinion) ("We have relied on those well-considered Notes as a useful guide in ascertaining the meaning of the Rules."), *with, e.g.*, *id.* at 167-68 (Scalia, J., concurring in part and concurring in judgment) ("I have previously acquiesced in, and indeed myself engaged in, similar use of the Advisory Committee Notes. More mature consideration has persuaded me that is wrong . . . . [T]he promulgated Rule says what it says, regardless of the intent of its drafters." (citations omitted)).

[4] State supreme courts are divided on this issue as well. *Compare, e.g.*, *Woods v. State*, 696 P.2d 464, 467 (Nev. 1985) ("In determining whether the declarant in fact made the proffered statement, the trial court may consider the credibility of the [in-court] witness.") (citing *Laumer*), *and State v. Stridiron*, 777 N.W.2d 892, 902 (N.D. 2010) ("the district court should analyze . . . the credibility of the in-court witness"), *with, e.g.*, *Carpenter v. State*, 785 So. 2d 1182, 1203 (Fla. 2001) ("[T]he credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony concerning the out-of-court statement."), *Gray v. State*, 796 A.2d 697, 706 (Md. 2002) ("There is nothing . . . in any of our cases . . . that in a jury trial specifically permits a trial court to make a factual assessment of the trustworthiness of the in-court relator of the out-of-court declaration that exculpates a defendant."), *and Commonwealth v.*

(continued…)

## B. Revisiting a Prior Decision

"The rule is fundamental in our jurisprudence that 'no division of this court will overrule a prior decision of this court.'" *Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1075 (D.C. 1998) (quoting *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)). "[S]uch [a] result can only be accomplished by this court en banc." *M.A.P.*, 285 A.2d at 312. In this case appellants go one step further by asking a division of this court to declare that one of our landmark en banc decisions is no longer good law.

Of course, "a 'panel cannot blindly follow [a] prior ruling in the face of clearly controlling doctrine later enunciated by the Supreme Court.'" *Teoume-Lessane v. United States*, 931 A.2d 478, 494 (D.C. 2007) (alteration in original) (quoting *Frendak v. United States*, 408 A.2d 364, 379 n.27 (D.C. 1979)). Moreover, a panel is not obliged "'to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions,' or by our own supervening rulings en banc." *Lee v. United*

(…continued)
*Drew*, 489 N.E.2d 1233, 1241 n.11 (Mass. 1986) ("[T]he credibility of the witness is a question for the jury.").

*States*, 668 A.2d 822, 828 (D.C. 1995) (citation omitted) (quoting *Frendak*, 408 A.2d at 379 n.27); *see Thomas v. United States*, 731 A.2d 415, 421 (D.C. 1999) ("[T]he 'philosophical basis' of *Procter* and *Brewster* has been substantially undermined by *Muniz* and its progeny."). Nevertheless, "[t]his court will not lightly deem one of its decisions to have been implicitly overruled and thus stripped of its precedential authority." *Lee*, 668 A.2d at 828.

## C. Analysis

Appellants contend that subsequent opinions of this court and the Supreme Court have invalidated the first prong of *Laumer*. They are mistaken. A division of this court addressed this same question in *Gilchrist v. United States*, concluding that the appellant had cited "no decision from the Supreme Court or this court explicitly declaring that a trial court which determines the credibility of a witness, offered to repeat a declarant's statement against penal interest, violates the Fifth and Sixth Amendments to the Constitution." 954 A.2d 1006, 1013 (D.C. 2008). Furthermore, we explained, "not one of the cited cases overrules the *Laumer* test." *Id*.

Appellants present us with no cases from either court addressing this question since *Gilchrist* was decided. They assert instead that the opinion in *Gilchrist* is not binding on this panel because the issue was considered under plain error review and the court's analysis of the first prong of *Laumer* is dictum in any event. But regardless of whether that discussion is dictum or an alternative holding, it demonstrates that three other judges of this court were not persuaded that the rationale of *Laumer* has been undermined. The comment in the advisory committee note to the amended federal rule has been issued since *Gilchrist* was decided, but we do not consider that development sufficient to undermine the analytical framework of one of our en banc holdings. Just as the *Gilchrist* court explained, without a Supreme Court decision or a supervening en banc ruling from this court that undermines it, *Laumer* remains good law.[5]

---

[5] Appellants cite several cases where we have commented on the danger of a trial court "usurp[ing] the jury's prerogative of determining credibility." *Boyd v. United States*, 473 A.2d 828, 832 (D.C. 1984). *See, e.g.*, *Brisbon v. United States*, 894 A.2d 1121, 1130 (D.C. 2006) (trial court erred in finding that "appellant's longtime friend" was "not a reliable witness" to testify about an excited utterance that met the foundational requirements for admission); *Newman v. United States*, 705 A.2d 246, 259 (D.C. 1997) (highlighting the distinction between evaluating the reliability of a proffer and evaluating the reliability of the witness because the question of the witness's credibility was for the jury to decide). Even though appellants are making similar constitutional objections to the first prong of *Laumer*, the situation here is very different, where the trial court was bound to follow the dictates of an en banc opinion of this court. In *Brisbon*, by contrast, the trial court added its own credibility assessment to the test for admitting an excited utterance.

Judge Leibovitz assessed the credibility of Mr. Hager as part of her admissibility determination, as *Laumer* instructs her to do, and made a well-supported finding that the proffered hearsay statement was never made.[6] Because the statement did not meet one of *Laumer's* foundational requirements, appellants had no right to present this evidence to the jury. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

## III.  The Initial Aggressor Instruction

In a supplemental *pro se* brief, appellant McCorkle argues that the trial court erred when it declined to provide what he terms the "Initial Aggressor" instruction.

---

[6] Mr. Hager had a significant record of impeachable convictions and failed to mention the exculpatory declaration in a previous lengthy statement to investigators.  He also had a close relationship with the accused and knew that Mr. Joyner was dead.  Although it ruled that Mr. Hager's testimony was incredible, the trial court found that the other two prongs of *Laumer* were met.  Joyner, the declarant, was dead and therefore unavailable, and there were corroborating circumstances to support a claim that he was the second shooter.

What he really asked for was an instruction explaining when an initial aggressor may regain his right to self-defense by withdrawing from a conflict.

The jury was told that "[i]f you find that the defendant was the aggressor, he cannot rely upon the right of self-defense to justify his use of force." *See* Criminal Jury Instructions for the District of Columbia, No. 9.504(A) (5th ed. rev. 2013). Judge Leibovitz clarified that "[m]ere words without more by the defendant . . . do not constitute aggression." *See id*. This instruction was appropriate because there was ample evidence, including McCorkle's own testimony, that he began the shooting.

A supplement to the standard "initial aggressor" instruction, entitled "Deadly Force Where Defendant Withdraws," explains that "if one who [is the aggressor] . . . later withdraws . . . in good faith, and communicates that withdrawal by words or actions, s/he may use deadly force to save himself/herself from imminent danger of death or serious bodily harm." Criminal Jury Instructions for the District of Columbia, No. 9.504(C) (5th ed. rev. 2013) (brackets in original). McCorkle requested this instruction, but Judge Leibovitz declined to give it, explaining that "no version of the facts . . . supports a theory of withdraw[al] here[.]"

McCorkle argues that he was entitled to the withdrawal instruction because he "made every attempt to calm Hough down and disengage from the verbal altercation. Failing this, [he] physically disengaged from the altercation when he apologized and, after attempting to shake Hough's hand, left the BP gas Station and set off on foot in the direction of his home." However, he acknowledges that "[i]t matters little who the initial aggressor was at the BP Gas Station because the shooting did not take place there." McCorkle's statement echoes Judge Leibovitz's analysis. She declined to provide the withdrawal instruction because, while McCorkle was walking away, there was "as yet, no conflict from which to withdraw or physical confrontation as to which the self-defense issue has arisen." She therefore "conclude[d] that there is no basis for the withdrawal instruction on those facts, taking them in the light most favorable to Mr. McCorkle."

Judge Leibovitz added that "the only other moment where arguably withdrawal could even be discussed is when, according to Mr. McCorkle, he has shot and killed two people in self-defense, they are both visibly and certainly dead, and he . . . is now fleeing." We agree that there was no factual basis for a withdrawal instruction in this case. *See Jones v. United States*, 999 A.2d 917, 922

(D.C. 2010) ("A trial court 'may properly decline to give [a defendant's requested] instruction where there is no factual or legal basis for it.'" (alteration in original)).

In any event, the failure to give the withdrawal instruction would only matter if the initial aggressor instruction, as given, caused the jury to believe that McCorkle forfeited his right to act in self-defense by sparking the verbal conflict at the gas station attendant's booth. But there is no reason to believe that the instruction would have had this effect. The jury was told that "mere words without more . . . do not constitute aggression." Moreover, none of the parties argued that the violence began before McCorkle started walking away. Because the initial aggressor instruction was properly given and there was no factual basis for a withdrawal instruction, we reject appellant's argument.

## IV.  Other Claims

### A.  The New Year's Eve Assault

During his direct testimony, McCorkle said that Harlenia Ray was "like a little cousin" to him and that they were on "[g]ood terms. We were like family." On cross-examination, he discussed his possession of various firearms over time

and said that he had traded the semi-automatic pistol he used in the homicide for a revolver. McCorkle then denied that he had ever had a revolver prior to the murders. The government asked whether he possessed a revolver on "New Year's Eve, December 31st, 2007, into January 1st, 2008?" McCorkle said he did not and, after his counsel's objection was overruled,[7] the prosecutor engaged in the following questioning:

> Q: You did not have a revolver?
>
> A: No.
>
> Q: You did not point that revolver at anybody?
>
> A: No.
>
> Q: You did know Harlenia Ray, correct?
>
> A: Yes. Precious.
>
> Q: And on New Year's Eve, she was 14 years old.

---

[7] McCorkle moved *in limine* to preclude the government from asking Harlenia Ray, as it did in the grand jury, about an assault on New Year's Eve 2007 in which he allegedly pointed an unloaded pistol at her and pulled the trigger. The trial court agreed, ruling that it was "an extremely inflammatory incident with very low probative value." When the government mentioned New Year's Eve 2007 during its cross-examination of McCorkle, his counsel immediately objected to the question's relevance. The court subsequently ruled that, "to the extent that Counsel is not planning to ask more questions . . . about what happened on New Year's Eve," the testimony was relevant because McCorkle's "whole explanation about how he came to have a revolver [w]as closely associated with his explanation of [which] gun he had the night of [the triple homicide.]"

A: Thirteen or 14.

McCorkle subsequently moved for a mistrial, arguing that the government "asking about Harlenia Ray in the same line of questioning leaves the impression that he pointed a revolver at [her] on New Year's Eve."

We agree with the trial court that "it's not in the record that the gun was being pointed at Harlenia Ray." The jury had not heard the discussion of the motion *in limine*, see s*upra* note 7, and without this background information, the meaning of this exchange might not have been entirely clear. Without this context, the jury could have been left with varying impressions, including that Harlenia Ray was a witness to an assault. We are at a loss to understand what legitimate point the prosecutor was attempting to make by identifying Harlenia and referring to her age. Moreover, the questioning about whether McCorkle had a revolver six months before the shootings had tangential probative value, at best, in light of other evidence. But, even assuming that the questions and answers had some prejudicial effect, the jury heard four weeks of testimony that included evidence that McCorkle randomly shot at a parked car on another occasion, assaulted and threatened witnesses in the case, and acknowledged possessing multiple firearms.

In these circumstances, the limited reference to the New Year's Eve 2007 assault did not constitute reversible error.

## B.  The Death of Mr. Joyner

Clinkscale additionally argues that the trial court abused its discretion when it prevented him from eliciting testimony that Trey Joyner was killed by law enforcement officers.  He notes that, "[t]hroughout the trial, there was a pervasive air of intim[id]ation of witnesses" and, "[i]n this context, the mysterious reference to the death of Mr. Joyner raised many questions."  He therefore contends that there was a "real risk of prejudice raised by the jury being left to speculate wh[y] such a central figure to the case was deceased with no explanation as to the cause of his death."

The government responds that it was irrelevant how Joyner died, particularly because Clinkscale agreed to the following limiting instruction:  "[T]here is no evidence, information or suggestion that either of the defendants in this case had

anything to do with the death of Trey Joyner." This admonition was repeated during the final instructions to the jury.[8]

The circumstances of Trey Joyner's death were unrelated to any of the crimes charged here. Any remote possibility that the jury would have blamed appellants for killing him was dispelled by the trial court's instruction. We see no merit in Clinkscale's claim that this instruction, to which he agreed, did more harm than good. In fact, it is fanciful to think that the instruction would cause jurors to speculate in the exact manner it was designed to prevent.

## V. Conclusion

The judgments of the Superior Court are hereby

*Affirmed.*

---

[8] The trial court instructed that "[y]ou have heard evidence that a person named Trey Joyner is no longer alive. There is no evidence that either defendant or anyone associated with either defendant ever played any role in Mr. Joyner's death." Perhaps it would have been clearer to say: "Neither defendant nor anyone associated with them had anything to do with the death of Mr. Joyner."

WASHINGTON, *Chief Judge*, concurring: While I concur in the decision affirming the trial court's decision, because *Laumer* is still controlling law to which this panel is bound, I respectfully write separately to express my concerns about the continued application of the first prong of *Laumer* to decisions regarding the admissibility of out-of-court statements against penal interest.

Judge Fisher, in his concurring opinion, makes great efforts to distinguish a trial court's credibility determinations for purposes of admissibility from a jury's determinations of credibility as fact-finders in the case. From my perspective, however, any test for determining the admissibility of evidence under the statement against penal interest exception that explicitly requires the court to assess the "general credibility" of the witness goes beyond the gatekeeping function of the court and strays too far into the province of the jury. Applying the first prong of *Laumer* in the present case, Judge Leibovitz considered a number of factors before concluding that the witness was not credible, including the witness's considerable record of impeachable convictions, his failure to mention the exculpatory declaration in a previous lengthy statement to investigators, and his close relationship with the defendant. Those facts are all appropriate considerations for assessing the general credibility of a witness and may have led the jury to determine, as the trial court did here, that the witness was lying about the fact that

the statement was ever made. But to prevent the jury from hearing testimony about a potentially exculpatory statement that otherwise meets the test for reliability under the third prong of *Laumer* deprives the defendant of an opportunity to have the jury perform its traditional role of making credibility determinations and weighing the evidence.

To avoid such an intrusion into the province of the jury, but remain faithful to the trial court's obligation to ensure that only reliable evidence is considered by the court, I believe *Laumer*'s third prong, which requires the defendant to demonstrate corroborating circumstances that clearly indicate the trustworthiness of the out-of-court declaration, is sufficient to satisfy the trial court's gatekeeping purpose.[1] This is the preferred approach among a majority of federal and state courts. It also comports with the revised commentary by the Advisory Committee on Evidence Rules cited by the majority,[2] and a series of decisions by this court

---

[1] *See Laumer v. United States*, 409 A.2d 190, 200 (D.C. 1979) (stating that the proponent of a proffered declaration against penal interest must overcome a "significant burden" to clearly demonstrate the trustworthiness of the declaration under the corroboration requirement).

[2] Advisory Committee Note on the 2010 Amendment to Fed. R. Evid. 804 (b)(3), 28 U.S.C.A., p. 338 (West 2012) ("In assessing whether corroborating circumstances exist, some courts have focused on the credibility of the witness who relates the statement is not a proper factor for the court to consider in assessing corroborating circumstances. To base admission or exclusion of a

(continued…)

holding that trial court credibility assessments are improper as a basis for excluding testimony from being admitted into evidence.[3]

Accordingly, I urge the court to consider, en banc, whether the first prong of the *Laumer* test should continue to be a factor for trial courts to consider when determining the admissibility of statements against penal interest.

FISHER, *Associate Judge*, concurring:  Because my colleagues have called for reconsidering the first prong of *Laumer*, I append these brief remarks to explain that appellants' attack upon *Laumer* is flawed.  It has long been the rule "that preliminary evidentiary questions such as . . . the admissibility of evidence are within the control of the trial judge.  However, these questions must be distinguished from credibility and weight to be assigned to competent and

---

(…continued)
hearsay statement on the witness's credibility would usurp the jury role of determining the credibility of testifying witnesses.").

[3]  *See, e.g.*, *Brisbon v. United States*, 894 A.2d 1121, 1129 (D.C. 2006) (holding that the question of credibility of a witness was for the jury to consider, not the trial court, in the context of proffered testimony under the excited utterance exception to the hearsay rule); *Newman v. United States*, 705 A.2d 246, 259 (D.C. 1997) (stressing that in evaluating reliability of proffered testimony, a trial court must not seek to evaluate reliability of the witness because the question of the excluded witness' credibility was for the jury, not for the judge).

admissible testimony." *Fowel v. Wood*, 62 A.2d 636, 637 (D.C. 1948); *see* Fed. R. Evid. 104 (a) ("The court must decide any preliminary questions about whether . . . evidence is admissible."); Advisory Committee Note to 1972 Proposed Rule 104 (a) ("To the extent that these inquiries are factual, the judge acts as a trier of fact."). Appellants' singular focus on the propriety of a judge making credibility determinations misunderstands this basic distinction. The *Laumer* test (including, of course, its first prong) is used to determine *whether* particular evidence is competent and admissible.

We have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); s*ee Laumer*, 409 A.2d at 195 n.7 ("[T]his court is the final authority for establishing the evidentiary rules for the Superior Court of the District of Columbia."). Despite this latitude, the Constitution forbids the creation of evidentiary rules that "'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324-25 (alteration in original) (some internal quotation marks omitted). In this context, arbitrary rules are rules that "exclude[] important defense evidence but . . . [do] not serve any legitimate interests." *Id*. at 325.

One undoubtedly legitimate interest of evidentiary rules is to exclude unreliable evidence. *United States v. Scheffer*, 523 U.S. 303, 309 (1998) ("[T]he exclusion of unreliable evidence is a principal objective of many evidentiary rules."). Recognizing the importance of this objective, our exception to the hearsay rule for statements against penal interest requires a showing that "the declarant, in fact, made a statement." *Laumer*, 409 A.2d at 199. We adopted this foundational prerequisite, among others, in order to ensure that the proffer contains "a sufficient guarantee of trustworthiness." *Id*. at 203;[1] *see In re M.L.H.*, 399 A.2d 556, 558 (D.C. 1979) ("[I]t is the trial court's responsibility to examine the [hearsay] testimony and determine whether the proper foundation has been laid for the exercise of discretion as to its admission.").

In this case, the statement appellants sought to admit was not admissible unless it qualified as an exception to the rule against hearsay. *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("The hearsay rule, which has long been

---

[1] Our formulation of the test in *Laumer* was informed by the House Judiciary Committee's explanation that Fed. R. Evid. 804 (b)(3)'s corroboration requirement arose from a concern "that declarations against penal interest were more 'suspect' than declarations offered for other purposes and . . . the Rule as originally drafted would not go far enough in preventing fabrication[.]" *Laumer*, 409 A.2d at 198 (citing H.R. Rep. No. 650, 93d Cong., 1st Sess. 16 (1974), U.S. Code Cong. & Admin. News 1974, pp. 7051, 7089).

recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact."). As discussed above, the *Laumer* test strikes a balance between admitting probative evidence and excluding evidence that is unreliable. There is nothing arbitrary about an evidentiary rule that attempts, on a case-by-case basis, to reconcile these legitimate, yet sometimes conflicting, concerns.

RUIZ, *Senior Judge*, concurring: I join Chief Judge Washington in expressing the view that the issue of the wisdom, indeed the constitutionality, of the first prong in the *Laumer* test is ripe for review by the court en banc. *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979) (en banc). As the authorities cited in Judge Fisher's opinion for the court make clear, the tide is decisively turning against an evidentiary rule that permits a judge (to the exclusion of the jury) in a criminal case to make credibility determinations regarding the testimony of an in-court witness and, based on that credibility determination, to preclude the defense from introducing evidence of an out-of-court declaration that otherwise meets the requirements for admissibility as a statement against penal interest. See *ante* notes 2 (citing federal appellate courts) and 4 (citing state supreme courts); Advisory Committee Note on the 2010 Amendments to Fed. R. Evid. 804 (b)(3), 28 U.S.C.A., p. 338 (West 2012).

This court's *Laumer* opinion adopting the statements against penal interest exception to the hearsay rule did not consider whether the first prong of the test for admissibility trenched on the jury's prerogative and the defendant's Fifth and Sixth Amendment rights to present a defense and to a jury trial. Interestingly, however, *Laumer* did recognize that once a statement is deemed admissible (i.e., after the trial court has passed on the credibility of the in-court witness), "the truth of the statement as well as the credibility of the witness who repeats the statement [in court] must be weighed by the trier-of-fact." 409 A.2d at 196. Apparently the question of whether the jury should have a similarly decisive role when the trial court finds the in-court witness not credible was not raised to the court. In the thirty-five years since *Laumer* that issue has been brought into focus by a number of Supreme Court cases that jealously guard the jury's role as the ultimate fact-finder on matters concerning guilt and maximum exposure to punishment. *See, e.g.*, *Holmes v. South Carolina*, 547 U.S. 319, 329-31 (2006) (striking down as "arbitrary" a rule that permitted the trial court to exclude the defendant's third-party perpetrator evidence, even if probative, if the court evaluated evidence of the defendant's guilt as strong); *Blakely v. Washington*, 542 U.S. 296, 313 (2004) (holding a sentencing scheme unconstitutional because it permitted judges to increase sentences based on their own findings of fact); *Apprendi v. New Jersey*,

530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum [sentence] must be submitted to a jury, and proved beyond a reasonable doubt."). In cases dealing with the admissibility of defense evidence generally, we have made clear that it is the fact-finder, not the trial court that must assess the credibility of a proffered witness. *See*, *e.g.*, *Brisbon v. United States*, 894 A.2d 1121, 1130 (D.C. 2006) (reversing conviction where defense witness was excluded based on judge's determination that witness was biased, noting that is "essentially a credibility determination that should have been left to the jury"); *Brown v. United States*, 740 A.2d 533, 537 (D.C. 1999) ("Conditioning bias cross-examination on the court's ability to assess the credibility of the source of [an] alleged motive [to fabricate] runs too close to usurping the jury's function."); *Newman v. United States*, 705 A.2d 246, 259 (D.C. 1997) (noting that in evaluating a proffer for admissibility, the trial judge must be careful to refrain from evaluating the credibility of the witness). We have also warned against judicial rules based on "excessive mistrust of juries." *Allen v. United States*, 603 A.2d 1219, 1224 (D.C. 1992) (en banc) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir. 1987)); *Winfield v. United States*, 676 A.2d 1, 7 (D.C. 1996) (en banc).

It has long been recognized that courts may adopt rules to regulate the admissibility of evidence to that which is relevant, reliable, and not unduly prejudicial. *See Holmes*, 547 U.S. at 326-27 (citing cases). But that authority must be used only when necessary for a legitimate purpose and in line with the constitutional rights of the parties. *See id*. at 330-31 (holding that state's evidentiary rule "violates a criminal defendant's right to have 'a meaningful opportunity to present a complete defense'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986))). The time has now come for the en banc court to revisit the first prong of *Laumer* and fully consider the challenge raised by appellants to its necessity as a means to excluding unreliable evidence from tainting a trial and, more fundamentally, its constitutionality in light of supervening jurisprudence giving preeminence to the jury's role in making ultimate credibility determinations.